**WO**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | No. CV-05-4158-PHX-JAT |
| MICHAEL KEITH SCHUGG, dba SCHUBURG HOLSTEINS, | BK No. 2-04-13326-GBN<br>BK No. 2-04-19091-GBN |
| Debtor. | CHAPTER 11 |
| In re: | (Jointly Administered and Substantively Consolidated) |
| DEBRA SCHUGG, | |
| Debtor. | |
| MICHAEL KEITH SCHUGG, | |
| Appellant, | **ORDER** |
| vs. | |
| G. GRANT LYON, Trustee; GILA RIVER INDIAN COMMUNITY; and WELLS FARGO BANK, N.A., | |
| Appellees. | |

Pending before the Court is Michael Keith Schugg's Appeal from the bankruptcy court's December 8, 2005, order approving settlement and authorizing the sale of the bankruptcy estate's principal asset.

I.      BACKGROUND

Michael Keith Schugg ("the Appellant") obtained approximately 657 acres of improved real estate ("Section 16") from S&T Dairy, LLC.  Section 16 was originally obtained from the State of Arizona around 1927[1] and held in fee simple by the subsequent owners, including the Appellant. Section 16 is located within the Gila River Indian Reservation.  The parcel is allegedly land-locked by land owned by or held in trust for the Gila River Indian Community (the "GRIC").  Section 16 was used openly by the successive owners of the property for approximately 70 years without any objection or claim to title from the GRIC.  Additionally, easements across the surrounding land for ingress and egress[2] as well as utilities were also openly utilized with the implicit or explicit permission of the GRIC.[3]

Prior to conveying Section 16 to the Appellant, S&T Dairy LLC, built a working dairy farm on Section 16.  Upon obtaining Section 16, the Appellant began operating the farm using the name "Schuburg Holsteins."  According to the Appellant, the value of improvements made on Section 16, not including the potential for income generated from leasing the dairy farm, approximate $9 million.

On July 29, 2004, the Appellant filed a petition for Chapter 11 bankruptcy.  The Appellant

---

[1] The exact chain of title is not at issue in this case.  The land was allegedly granted to the State of Arizona by the United States Government.  (Dec. 6, 2005, Tr. at p. 17).  The Gila River Indian Community conceded that the Appellant was the fee owner of Section 16 as recently as January 14, 2004. (January 14, 2004, letter from the GRIC to the Pinal County Board of Supervisors).

[2] The Smith-Enke and Murphy roads lead to Section 16.

[3] There are numerous legal and factual issues surrounding the easements that are disputed. What is not disputed, however, is that the land was openly accessed, used, and improved by the successive fee owners without objection by the GRIC until approximately 2004.

continued to operate and manage the dairy farm until December 9, 2004, when the bankruptcy court entered its order appointing the Trustee.

Lennar Homes contracted to purchase Section 16 from the Appellant for approximately $26 million. As part of the negotiation process with Lennar Homes, the Appellant sought to change the land use designation of Section 16 with Pinal County. The GRIC opposed the requested land use amendment. Specifically, they wrote a letter to the Pinal County Board of Supervisors acknowledging that the Appellant was the fee simple owner of Section 16, but arguing that because Section 16 is surrounded by "Indian country," the GRIC has the right to control the use of the land, notwithstanding the Appellant's ownership of it. The Pinal County Board of Supervisors denied the Appellant's request to change the land use designation. As a result, the Appellant was unable to sell Section 16 to Lennar Homes as previously agreed. The Appellant continued to market the property through his own real estate broker until the bankruptcy court appointed the Trustee on December 9, 2004.

On January 31, 2005, several cows in the Appellant's dairy herd tested positive for tuberculosis. The herd was destroyed pursuant to a depopulation agreement with the United States Department of Agriculture. Wells Fargo has a lien on the proceeds from the depopulation of the dairy herd. As a result of these events, the bankruptcy estate does not derive any cash flow from the dairy herd. Accordingly, Section 16 and its improvements, including the working dairy facility, are the primary assets of the Appellant's bankruptcy estate.

On April 26, 2005, the GRIC filed objections to certain "stipulations"[4] between the Trustee

_____

[4] The exact details of the stipulations entered into between Wells Fargo and the Trustee are unknown to the Court.

and Wells Fargo.  The GRIC alleged that it had "aboriginal title" to Section 16.  On May 13, 2005, the GRIC filed, for the first time, a proof of claim asserting an aboriginal title to the property, disputing the Appellant's ownership rights to Section 16.

On May 25, 2005, the Trustee and Wells Fargo filed an adversary proceeding in the bankruptcy court against the GRIC seeking to quiet title to Section 16 and to determine various easement rights.  The adversary complaint seeks to have the proof of claim filed by the GRIC set aside.  It seeks declaratory relief with respect to easements for ingress, egress, and utilities to Section 16.  On June 27, 2005, the GRIC filed a motion to dismiss the adversary proceeding alleging, among other things, that the bankruptcy court lacked jurisdiction over the title and access issues.  The GRIC filed a withdrawal of reference on June 29, 2005, requesting that the bankruptcy court transfer the adversary proceeding to the United States District Court for the District of Arizona for resolution.  On June 11, 2005, the GRIC filed a motion to stay the underlying bankruptcy case pending the disposition of the withdrawal of reference.

On August 9, 2005, the bankruptcy court entered an order granting the motion to stay.  The district court entered an order setting oral argument on the motion to withdraw the reference for January 8, 2005.  The Court subsequently granted the withdrawal of reference.  The adversary proceeding is now pending before this Court as No. CV-05-2045.[5]

_____

[5] On March 9, 2006, the Court denied the GRIC's motion to dismiss finding that: (1) significant fact questions exist regarding whether a claim for aboriginal title fits under the definition of trust or restricted Indian land; (2) the GRIC failed to make a colorable claim that Section 16 is trust or restricted Indian land; (3) this Court has authority to determine whether the GRIC was previously compensated for the extinguishment of its aboriginal rights and/or whether its aboriginal title claim suffers from statute of limitations or latches problems; and (4) there are disputed issues of fact regarding whether adjudication of the scope of the pre-existing easement of the Smith-Enke and Murphy roads would impact title to Indian lands and/or GRIC's title to the

Following the withdrawal of reference, the underlying bankruptcy case continued. The GRIC made it clear that it intended to continue to vigorously assert and litigate title and access claims to Section 16. Although the Trustee retained a broker to locate other buyers for Section 16, the GRIC's assertion of competing title and access claims directly and significantly chilled buyer interest in the property. The broker told the Trustee that "the GRIC's asserted claims effectively clouded the title to Section 16, making it virtually impossible for the [b]roker to find potential purchasers and/or investors." (November 23, 2005, Affidavit of Grant Lyon).

After consulting with legal counsel, the Trustee believed that the estate had a stronger legal position with respect to the competing title and access claims. (November 23, 2005, Affidavit of Grant Lyon ¶¶ 37, 43). However, concerned about the time and expense of litigation with the GRIC, the Trustee agreed to a settlement. Pursuant to the terms of the settlement, the GRIC would withdraw any claims clouding title to Section 16[6] as long as the GRIC was allowed to purchase Section 16, as the sole bidder, for the sum of $10.3 million.[7]

On November 28, 2005, the Appellant timely filed a request for an evidentiary hearing. The Appellant asked for an opportunity to conduct discovery and present evidence in support of his objection to the settlement with the GRIC and sale to the GRIC for $10.3 million. The Appellant filed a brief arguing that: (1) Section 16 could not be sold free and clear of the GRIC's claim pursuant to 11 U.S.C. § 363(f)(4); (2) the GRIC did not have a valid claim to ownership of Section

easements.

[6] The release specified that the GRIC would withdraw all claims to title including the formerly filed proof of claim, and the Trustee would withdraw its claims to title including the complaint for declaratory relief and adversary proceeding.

[7] The Purchase Agreement was drafted in early November of 2005.

16; (3) the GRIC was not a good-faith purchaser entitled to § 363(m) protection; (4) the actual market value of Section 16 was far more than $10.3 million;[8] and (5) there were contested issues of fact that require an evidentiary hearing.

Although none of the parties opposed the Appellant's request for an evidentiary hearing, the bankruptcy court declined to hold one. On December 6, 2005, the bankruptcy court heard oral argument. The bankruptcy court overruled the Appellant's objections and approved the settlement and sale of Section 16.

On December 8, 2005, the bankruptcy court issued an order authorizing the settlement agreement and approving the sale of Section 16. On December 19, 2005, the Appellant appealed the decision and order of the bankruptcy court by filing this action pursuant to 28 U.S.C.A. § 158(a). The Appellant argues that the bankruptcy court abused its discretion by: (1) determining that the GRIC was entitled to the protections of a "good-faith purchaser" pursuant to 11 U.S.C. § 363(m); (2) declining to conduct an evidentiary hearing before approving the sale and settlement; (3) approving the sale of Section 16 to the GRIC for $10.3 million; and (4) holding that the bankruptcy court lacked jurisdiction to sell the property on the open market and refusing to do so.

A settlement agreement and mutual release were subsequently negotiated between the GRIC and Wells Fargo. Wells Fargo agreed that it would provide releases in the adversary proceeding as long as the sale of the property closed by December 28, 2005. Due to the quickly impending sale, the Appellant filed a motion to stay the sale pending appeal. On December 19, 2005, the bankruptcy court denied the Appellant's motion to stay. On December 20, 2005, the Appellant filed

---

[8] Even with the title and access issues the property appraised at over $33 million.

an Emergency Motion to Stay in this Court requesting a stay of the sale pending resolution of this Appeal.  The Court held a hearing on December 22, 2005.  Having concluded that the Appellant showed a likelihood of success on the merits of his Appeal and a lack of substantial harm to the other parties, the Court granted the stay.

On April 11, 2006, the Appellant filed a request for judicial notice asking the Court to take judicial notice of an amended proof of claim filed by the GRIC.  The Court heard oral argument on the Appeal and pending motions on April 11, 2006, at 3:00 p.m.

II.     LEGAL STANDARD AND ANALYSIS

The Court has jurisdiction over this case pursuant to 28 U.S.C.A. § 158(a), which provides that "district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1) (1993).  This Court reviews the bankruptcy court's findings of fact under the clearly erroneous standard, and conclusions of law *de novo*.  *In re Lazar,* 83 F.3d 306, 308 (9th Cir. 1996); *Granite State Ins. Co. v. Smart Modular Techs.,* 76 F.3d 1023, 1028 (1996).

As a preliminary matter, the Court will address the Appellant's recently filed request for judicial notice.  On April 7, 2006, the GRIC filed a proof of claim amending the proof of claim filed on May 13, 2005.  The new proof of claim apparently narrows the GRIC's claims of title and access to Section 16.  The Appellant asks the Court to take judicial notice of this document.

The party requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice.  Fed. R. Evid. 201(b).  A court may take judicial notice of matters of public record.  *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001).

Likewise, a court may take judicial notice of judicial proceedings and filings which have a "direct relation to the matters at issue." *Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir. 1992).

This Court can take judicial notice of the fact that a document that has been filed in another court proceeding. *Lee,* 250 F.3d at 689-90.  However, this Court is not required to take notice of such a filing where there has been no showing of relevance to the issues raised in this case  *See, e.g., Carpenters S. Ca. Admin. Corp. v. Knight,* 207 F.3d 1115, 1119 n. 4 (9th Cir. 2000) (denying request for judicial notice of irrelevant facts).  This Appeal is based on the proof of claim filed on May 13, 2005, and the subsequent rulings of the bankruptcy court.  The fact that the GRIC has filed a new proof of claim has no bearing on the question of whether the bankruptcy court abused its discretion with respect to the issues raised in this Appeal.  The Appellant's request for judicial notice is denied.[9]

The Appellant raises four issues on appeal: did the bankruptcy court abuse its discretion by: (1) determining that the GRIC was entitled to the protections of a "good-faith purchaser" pursuant to 11 U.S.C. § 363(m); (2) approving the settlement of Section 16 and sale to the GRIC for $10.3 million; (3) declining to conduct an evidentiary hearing before approving the sale and settlement; and (4) holding that it lacked jurisdiction to sell the property on the open market?

A.      Good-faith purchaser

11 U.S.C. § 363(m) protects purchasers in good faith by providing:

reversal or modification on appeal of an authorization under subsection

---

[9]  This ruling has no bearing on the question of whether the amended proof of claim is relevant in the parallel adversary proceeding.

> (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith.

In other words, the statute prevents appellate courts from reversing sales that were made to a good-faith purchaser. § 363(m).

The bankruptcy court in this case held that the GRIC qualifies for protection under § 363(m). If this Court upholds this finding, the Appellant's remaining arguments are arguably moot. Therefore, the Court must determine, as a threshold matter, whether the bankruptcy court was clearly erroneous in determining that the GRIC is entitled to such protection.[10] For the reasons set forth below, the Court finds that the bankruptcy court's finding that the GRIC was a purchaser in good faith is clearly erroneous.

Although the Bankruptcy Code and Rules do not provide a definition of "good faith," courts generally have followed traditional equitable principles in holding that a "good-faith purchaser" is one who buys "in good faith" and for fair "value." *In re Ewell,* 958 F.2d 276, 281 (9th Cir. 1992). The requirement that a purchaser act in "good faith," of course, "speaks to the integrity of [the] conduct in the course of the sale proceedings." *In re Suchy,* 786 F.2d at 902. "Fair value" is generally found when the purchaser pays 75% of the appraised value of the assets. *Ewell,* 958 F.2d at 281.

The bankruptcy court held that there is "no evidence in the record that would support the [Appellant's] allegation that [the GRIC] is not a good faith purchaser." (Dec. 6, 2005, Tr. at 75).

---

[10] A bankruptcy court's factual finding that a purchaser of property acted in good faith is reviewed for clear error. *See, e.g., In re Cooper Commons,* LLC, 430 F.3d 1215, 1220 (9th Cir. 2005).

The Court disagrees.  The following conduct prior to and during the settlement negotiations raises serious questions about the integrity of the GRIC's conduct.

The Appellant and his successors in fee ownership have openly used Section 16 since sometime in the late 1920's. (December 6, 2005, Tr. at 17, 35; Response and Objection to Trustee's Motion for Order at p. 5).  A dairy farm was constructed on the property and was actively maintained and operated by the Appellant until December 9, 2004. (November 23, 2005, Affidavit of Grant Lyon ¶ 6).  There is no dispute that the GRIC did not assert any claims to rights to Section 16 or objections to the easements asserted by the Appellant until the Appellant filed for bankruptcy and attempted to get the land use designation changed so he could sell the property to Lennar Homes. (Dec. 6, 2005, Tr. at 32-34; November 23, 2005, Affidavit of Grant Lyon ¶¶ 9, 10, 25, 29-31).

At the initiation of the bankruptcy proceeding, the Appellant had already received a bid from Lennar Homes on Section 16 for an amount in excess of $26 million. (Affidavit of Grant Lyon ¶¶ 25-28).  Because the GRIC objected to the idea that a master planned community would be built on Section 16, Lennar's bid on the property was intentionally stymied by the GRIC when it argued for the first time that Section 16 is surrounded by "Indian country," and the GRIC has the right to control the use of the land, notwithstanding the Appellant's ownership of it.  (Dec. 6, 2005, Tr. at 15, 31-34;  November 23, 2005, Affidavit of Grant Lyon ¶¶ 28-30).

Then the GRIC created a cloud on Section 16's title by filing a proof of claim asserting, for the first time, that it had aboriginal rights to the property. (November 23, 2005, Affidavit of Grant Lyon ¶¶ 29-31).  When the Appellant filed bankruptcy and it became clear that Section 16 was going to be sold to the highest bidder, suddenly claims to title, access, and land use rights

materialized where none had ever been before.  This, despite the fact that the GRIC had not only allowed 70 years of use and improvements to the land, but openly conceded in 2004 that the Appellant had fee ownership of the land.  (January 14, 2004, letter from the GRIC to the Pinal County Board of Supervisors; Exhibit C to Objection to Trustee's Motion for an Order).  It is undisputed that as a result of the GRIC's actions it became "virtually impossible" for the Trustee and the broker it hired to find third-party purchasers or investors who were interested in Section 16. (November 23, 2005, Affidavit of Grant Lyons ¶ 24).  It was with this background that the GRIC and the Trustee negotiated the sale of Section 16.

Mr. Schian made a good analogy when he stated at oral argument before the bankruptcy court that the law simply does not allow the owner of land to stand by and watch a house being built on the land by someone believing in good faith that the land is theirs, and only after the improvements have been fully completed, come forward and say, "thank you for the free house." The GRIC's actions in this case seem no less unconscionable.  The GRIC failed to make any title or access claims to Section 16 for some 70 years, led the individuals using the land to believe that they held the land in fee simple, stood idly by as the individuals borrowed money using the land as security, and had no objection when the individuals made millions of dollars worth of improvements to the land. Only after Section 16 became part of the Appellant's bankruptcy estate and was subject to sale on the open market did the GRIC come forward at the eleventh hour and assert title, access, and land-use rights to the land.  Finally, the GRIC agreed to settle the competing claims by purchasing the land for 1/3 of the open-market value of the property. At the very least, these facts create a suggestion of impropriety that is contrary to the meaning of a good-faith purchaser as defined by § 363(m).

Additionally, the terms of the settlement and sale of Section 16 do not suggest that the sale was "for value."  The settlement made the GRIC the sole bidder on Section 16 and ensured that the property would be sold to the GRIC for a mere $10.3 million, roughly 1/3 of the appraised[11] market value of the property.  (Dec. 6, 2005, Tr. at 9, 29; Purchase Agreement; Settlement Agreement and Mutual Releases).  As noted previously, "fair value" can only be presumed when a purchaser pays 75% of the appraised value of the property.  *Ewell,* 958 F.2d at 281.

Members of "the local real estate community (Phoenix metropolitan community in general, and Pinal County specifically) understood that the GRIC would actively and vigorously pursue its allegedly superior right and title to zoning, access, and title claims concerning Section 16." (November 23, 2005, Affidavit of Grant Lyon ¶ 32; Dec. 6, 2005).  After blocking the $26 million dollar bid the Appellant had on Section 16, clouding title so that it was impossible to obtain a new fair market bid on Section 16, and threatening to fund lengthy and expensive litigation, the GRIC was able to strong-arm the Trustee and compel a settlement that gave the GRIC preferential treatment.  (November 23, 2005, Affidavit of Grant Lyon ¶¶ 32, 38-39, 44-49; Dec. 6, 2005, Tr. at 48).  This was done over the Appellant's assertion that the sale price was grossly below the fair market value of the property, (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 9, 11, 13, 48; Dec. 19, 2005, Tr. at 12, 26), and despite the fact that the Trustee obtained legal advice stating that the law was against the GRIC with respect to the competing title and access claims.  (November 23, 2005,

---

[11] The Appellant brought a certified appraisal to oral argument before the bankruptcy court.  Section 16 and its improvements appraised at $33 million dollars, notwithstanding the unresolved claims with respect to title, access, and zoning.  (Dec. 6, 2005, Tr. at 9, 11).

Affidavit of Grant Lyon ¶ 37-38, 43-44; Dec. 6, 2005, Tr. at 42; Dec. 19, 2005, Tr. at 29).

The bankruptcy court stated on the record that it was "clear that the [GRIC]'s claims chilled the market value" of Section 16. (Dec. 6, 2005, Tr. at 27-28). In addition to showing a lack of good faith, it is neither fair nor reasonable to the debtor for a potential purchaser to actively cloud title to a bankruptcy estate asset then purchase the asset, as the sole bidder, at a rate that is *significantly* below the appraised market value of the property.

As late as January 14, 2004, the GRIC was still acknowledging that the Appellant was the fee owner of Section 16. (January 14, 2004, letter from the GRIC to the Pinal County Board of Supervisors; Exhibit C to Objection to Trustee's Motion for an Order). The bankruptcy court asked the GRIC how the GRIC could, "in good faith," stand by years while Section 16 was openly used, and only assert a claim to title after millions of dollars of improvements were made to the property. The GRIC's only explanation was that the GRIC had no "need to assert this aboriginal title issue" until the land was going to be used for a purpose that the GRIC did not agree with. (Dec. 6, 2005, Tr. at 31-32). The GRIC's disagreement with the Appellant's intended use for the land is insufficient to explain or justify the GRIC's questionable conduct surrounding the settlement, for less than fair value of the property, between the GRIC and the Trustee.

There cannot be a finding of good faith where there is evidence of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage. *In re Ewell,* 958 F.2d at 281; *In re Suchy,* 786 F.2d 900, 901-02 (9th Cir. 1985) (construing Federal Rule of Bankruptcy Procedure 805, from which § 363(m) is derived). Based on the facts in record, it appears that GRIC actively: (1) positioned itself as the sole potential buyer of Section 16 by affirmatively clouding title to the property; (2) compelled settlement by threatening to drain the

bankruptcy estate's assets through prolonged litigation; (3) crafted a settlement with the Trustee that allowed the GRIC to purchase Section 16 for roughly 1/3 of the potential open market value of the property; and (4) negotiate a closing date that left Appellant with little opportunity to gather evidence so that he could adequately contest the settlement and impending sale before the bankruptcy court.

It was the Appellant's burden under § 363(m) to come forward with facts indicating that the GRIC was not a purchaser in good faith.  The Appellant set forth sufficient facts to raise a serious question regarding the integrity of the GRIC's conduct.  The Appellant could not have come forward with any additional facts or evidence, because he was denied the opportunity to conduct discovery, and to present evidence and/or cross examine witnesses at an evidentiary hearing on this issue.[12]  The Court finds that given the facts in the record, and under the circumstances set forth above, it was an abuse of discretion for the bankruptcy court to find that the GRIC is a good-faith purchaser for value as contemplated by 11 U.S.C. § 363 (m).  Because the GRIC is the one that caused any reduction in market value by affirmatively clouding title to Section 16 and chilling buyer interest, the terms of the sale in this case were neither fair nor reasonable.

B.  Evidentiary Hearing and Approval of the Settlement and Sale

The standard of review for a denial of an evidentiary hearing is abuse of discretion.  *Clymer v. U.S.*,  91 F.3d 151, __, 1996 WL 393510, *1 (9th Cir. 1996).  No purpose is served by an evidentiary hearing if all relevant facts are before the bankruptcy court and are not disputed.  *See, e.g., Two "S" Corp. v. Sun Nat'l Bank (In Re Two "S" Corp.),* 875 F.2d 240, 242 (9th Cir.1989).

---

[12] *See* discussion *infra* Part II B.

1   Thus, in cases where the facts are not in dispute and all evidence is before the court there is no

2   abuse of a bankruptcy court's refusal to hold an evidentiary hearing.  *Id.*  Here, however, the

3   Appellant set forth a number of disputed facts and a plethora of reasons why brief discovery and

4   an evidentiary hearing was necessary to address numerous factual issues before the bankruptcy

5   court could rule on the proposed settlement and sale of Section 16 to the GRIC.

6          The Appellant argued that he should be provided with an opportunity to present evidence

7   that was contrary to the declarations submitted by the Trustee that suggested that the only party who

8   could purchase Section 16 was the GRIC.  (Response and Objection to Trustee's Motion for an

9   Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 8).  For

10  example, the Appellant argued that he could present evidence that contradicted the GRIC's

11  aboriginal title and easement claims.  (Response and Objection to Trustee's Motion for an Order;

12  Motion for Evidentiary Hearing Pursuant to General Order 86; Dec 6, 2005, Tr. at 10, 17-19).  The

13  Appellant also argued that there was evidence that Section 16 was never included in any grant from

14  the federal government as reservation property.  (Response and Objection to Trustee's Motion for

15  an Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 18-

16  19).  Additionally, the Appellant stated that he had a claim of adverse possession, and cited recent

17  Supreme Court precedent[13] that held that claims of latches and waiver apply to aboriginal title

18  claims asserted against property that has been used and/or developed on Indian land.  (Dec. 6, 2005,

19  Tr. at 13-14).

20          The Appellant argued that he should have the opportunity to present evidence contradicting

---

[13] *City of Sherrill, N.Y. v. Oneida Indian Nation,* 125 S.Ct. 1478, 1494 (2005).

the GRIC's allegations that there are no valid easements to Section 16.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 9).  For example, he argued that he could present evidence showing that Section 16 is not completely surrounded by Gila River Indian Community Reservation, and in fact that two sides of the property are bordered by non-GRIC land over which the Appellant obtained valid easements from the Bureau of Indian Affairs.  (Dec. 6, 2005, Tr. at 18).  The Appellant argued that he can prove that he paid to install electrical poles down the road to bring utilities to the property, as well as to have the actual utilities installed.  (Dec. 6, 2005, Tr. at 10-11).  And the Appellant argued that he could prove that all of this was done with the knowledge and implicit consent of the GRIC. (Dec. 6, 2005, Tr. at 11).

The Appellant also argued that he should be allowed to present evidence that contradicted the Trustee's assertion that the GRIC is the only likely buyer of Section 16.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86).  The Appellant argued that potential purchasers were given the impression that only the GRIC could purchase the property with clear title and this drove away interest.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86).

The Appellant disputed the market value of the property and wanted to present evidence that the property was worth far in excess of the proposed $10.3 million sale price.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 9, 11-12, 30; Dec. 19, 2005, Tr. at 9, 12).  For example, the Appellant stated that he could provide evidence that he made more than $9 million in improvements to the

property, and the property had appraised, notwithstanding the potential title issues, in excess of $33 million.  (Dec. 6, 2005, Tr. at 8-9, 11, 29, 57).  The Appellant wanted an opportunity to argue that regardless of who has legal title, at a minimum, the Appellant is entitled to the reasonable value of the improvements he made to the property (including the utilities and construction of a working dairy farm), and he wanted to present evidence as to the value of those improvements as well as the value of leasing out the working dairy farm.  (*Id.* at 12, 57).

The Trustee and the Appellant both believed that the bankruptcy estate had the stronger legal position with respect to the access and title claims against Section 16.  (November 23, 2005, Affidavit of Grant Lyon ¶ 37-38, 43-44; Dec. 6, 2005, Tr. at 42).  Thus, the Appellant objected to the proposed sale at an amount that was less than 1/3 of the appraised  market value of Section 16, notwithstanding the potential for litigation with the GRIC.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 9, 12, 29).

The Appellant disagreed with the allegedly "undisputed" facts relied upon by the bankruptcy court in determining that the GRIC was a purchaser in good faith and that the settlement was fair and equitable.  The Appellant wanted an opportunity to present evidence that was relevant to the "purchaser in good faith," as well as the "fair and equitable" components.  In addition to the evidence already discussed above, the Appellant believed that following some additional discovery he could provide the bankruptcy court with evidence that suggested that the GRIC actively took steps to chill third-party interest in the property.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86; Dec. 6, 2005, Tr. at 27-30).

This Court has previously referred to the GRIC's actions in this case as throwing a "poison pill" into the mix.  And that is exactly what the GRIC did.  The fact that the Trustee's broker contacted more than 40 potential buyers or investors is irrelevant to the determination of whether $10.3 million is "fair value" because, as the broker told the Trustee, the GRIC's actions quite "effectively clouded the title to Section 16, making it virtually impossible for the [b]roker to find potential purchasers and/or investors."  (November 23, 2005, Affidavit of Grant Lyon ¶¶ 23-24). It does not matter how many potential buyers that the broker or Trustee contacted, once the GRIC had already "poisoned" the process by affirmatively raising competing claims with respect to zoning, easements, and title, there could not be any **fair** open-market bids on Section 16 until those claims were resolved.

The bankruptcy court denied the Appellant's request for an evidentiary hearing, and approved the settlement over the Appellant's objections.  (Dec. 6, 2005, Tr. at 58-78; December 8, 2005, Order of the Bankruptcy Court).  The bankruptcy court found that "the [T]rustee has provided a thorough review of the risk and benefits associated with the pending litigation involving the [GRIC]...and the [T]rustee's analysis supports a conclusion that I should approve the settlement as being in the best interest of the estate and approve the sale of the estate's interest in Section 16...." (Dec. 6, 2005, Tr. at 58-59).

In support of its holding, the bankruptcy court relied solely upon the Trustee's declaration and assertions regarding the value and marketability of Section 16.  (*Id.* at 59-69).  The court stated that these facts were "undisputed" and that the Trustee's declaration was "uncontested."  (Dec 6, 2005, Tr. at 71).  The Trustee's declaration was never admitted into evidence, and the Appellant was not given an opportunity to object or cross-examine that witness, or to present any other evidence

or witnesses.  The record on Appeal could not be clearer that the Appellant not only disputed these facts both in his pleadings and at oral argument before the bankruptcy court, but that his request for an evidentiary hearing and time to conduct further discovery was timely.  (Response and Objection to Trustee's Motion for an Order; Motion for Evidentiary Hearing Pursuant to General Order 86).

It is commonly recognized that evidence genuinely probative of "good faith" is not commonly introduced, or even reasonably available, at the time a bankruptcy court is asked to approve a settlement and/or sale.  *In re Thomas,* 287 B.R. 782, 785 (9th Cir. BAP 1992).  To the contrary, in most instances the fact-intensive evidence suggesting lack of "good faith" does not emerge until the time of the settlement and/or sale.  *Id.*  The bankruptcy court opined that the Appellant had not presented any evidence of bad faith, and was not entitled to additional discovery to look for such evidence.  (Dec. 6, 2005, Tr. at 28).  However, this Court would point out that evidence of bad faith is rarely freely offered by a party without the benefit of discovery.

As this Court's analysis *supra* at II A. indicates, the facts in record leading up to the settlement in this case raise a serious question as to whether the GRIC's actions were done in good faith, or with the intent to cloud title, stymie bids from potential third parties, reduce the market value of the property, and place itself in the favorable position of being the only likely purchaser of the property so that it could obtain it for a sum that is significantly below market value.  These questions could not have been resolved without an evidentiary hearing.

The bankruptcy court made its ruling based on evidence presented solely by the Trustee, rather than taking evidence on the disputed facts.  It did not even take evidence from the Appellant regarding Section 16's disputed fair market value, or the value of the improvements the Appellant made to the property.  This made it impossible for the bankruptcy court to reach an "informed and

independent" conclusion that the compromise was fair and equitable.

Although the bankruptcy court has the inherent power summarily to enforce a settlement agreement with respect to an action pending before it, *In re City Equities Anaheim, Ltd. v. Lincoln Plaza Development Co. (In Re City Equities Anaheim, Ltd.),* 22 F.3d 954, 958 (9th Cir. 1994), summary enforcement is inappropriate where material facts concerning the terms of a settlement agreement are in dispute. *Callie v. Near,* 829 F.2d 888, 890 (9th Cir. 1987). The transcript of the bankruptcy court's hearing makes it very clear that there was a factual dispute between the parties regarding the actual value of the property and its improvements. (Dec. 6, 2004, Tr. at 9, 11-13, 38). As noted above, the standard of review for the denial of an evidentiary hearing is abuse of discretion. *In re City Equities Anaheim,* 22 F.3d at 954; *Callie,* 829 F.2d at 890. However, a bankruptcy court has no discretion to enforce a settlement where, as here, there are material facts in dispute. *In re City Equities Anaheim,* 22 F.3d at 954; *Callie,* 829 F.2d at 890. In such cases, an evidentiary hearing **must** be held. *In re City Equities Anaheim,* 22 F.3d at 954; *Callie,* 829 F.2d at 890.

This Court is left with a firm conviction that the bankruptcy court committed a mistake in denying the Appellant's request to resolve the above issues with an evidentiary hearing following some brief discovery on the matter. The questions of fact raised by the Appellant are materially relevant not only to the question of whether the GRIC was a purchaser in good faith, but also to whether the settlement and proposed sale were fair and equitable.

While a bankruptcy court has great discretion in approving a settlement agreement, it cannot approve an agreement that is not fair and equitable. *Woodson v. Firemans Fund,* 839 F.2d 610, 620 (9th Cir. 1988). A bankruptcy court is obliged to consider, as part of the "fair and equitable"

analysis, whether the property of the estate that would be disposed of in connection with the settlement might draw a higher price through a competitive process, such as a sale.  *In re Mickey Thompson, Entertainment Group, Inc.,* 292 B.R. 415, 421-22 (9th Cir. BAP. 2003).  Additionally, whenever there is only one bidder on a property competition is constrained.  In such cases, the price offered is less likely to be reliable and should be examined more carefully because constrained competition requires higher scrutiny.  *In re Lahijani,* 325 B.R. 282, 289 (9th Cir. BAP 2005).

The bankruptcy court based its decision that the settlement in this case was reasonable after concluding that as a result of the pending litigation between the GRIC and the estate, the GRIC was "the only realistic buyer."  (Dec. 6, 2005, Tr. at 68).  Yet the only reason the GRIC was "the only realistic buyer" was because the GRIC eliminated all of its competition by clouding title to Section 16.  Given the facts in the record, including a proposed constrained sale for an amount that was less than 1/3 of the market value of the property, the bankruptcy court should have scrutinized the settlement agreement more critically, including allowing the Appellant the opportunity to conduct brief discovery, submit evidence, and cross-examine witnesses.

It was an abuse of discretion[14] for the bankruptcy court to approve a compromise when it did not have before it a factual foundation sufficient to establish that the compromise is "fair and equitable."  *In re A & C Properties,* 784 F.2d 1377, 1380 (9th Cir 1986).  The Court has a definite and firm conviction that the bankruptcy court committed a clear error of judgment in the conclusions it reached in this case.  *Marx v. Loral Corp.,* 87 F.3d 1049, 1054 (9th Cir. 1996).  The

---

[14] This Court reviews the bankruptcy court's approval of a compromise for abuse of discretion.  *In re A & C Properties,* 784 F.2d 1377, 1380 (9th Cir 1986); *In re Transcontinental Energy Corp.,* 764 F.2d 1296, 1298-99 (9th Cir. 1985).

bankruptcy court's December 8, 2005, order approving the settlement and sale of Section 16 is hereby set aside.

C.    Jurisdiction to Sell Section 16 as Property Subject to a Bona Fide Dispute

The Appellant contends that 11 U.S.C. § 363(f)(4) permits the bankruptcy court to sell Section 16 free and clear of the GRIC's claim of ownership.  In order to do this, the bankruptcy court would first have to fully adjudicate title to the property.  The bankruptcy court held that it did not have jurisdiction to adjudicate the GRIC's aboriginal title claim.  The Appellant has not provided this Court with any facts or law that suggest that this ruling was wrong.

The issues concerning title and access to Section 16 are the subject of the adversary proceeding that is presently being litigated before this Court.  In accepting jurisdiction over the case, this Court implicitly determined that this is a proper forum to litigate these issues.  Had the bankruptcy court chosen to proceed with a sale under 11 U.S.C. § 363(f)(4) prior to the resolution of the adversary proceeding in this Court, it would have created the potential of inconsistent rulings with respect to title and access to the property at issue.  The Appeal is denied to the limited extent that the Appellant seeks remand of this case for adjudication of title and access issues and the sale of Section 16 "free and clear" under 11 U.S.C. § 363(f)(4).

Accordingly,

/ / /

1

2

IT IS ORDERED GRANTING IN PART AND DENYING IN PART Michael Keith

Schugg's Appeal (doc. 1) consistent with the above opinion.

3

4

5

6

IT IS FURTHER ORDERED overruling the December 8, 2005, order of the bankruptcy

court approving the settlement and sale of Section 16.  The December 8, 2005, order of the

bankruptcy court is hereby SET ASIDE.

7

8

IT IS FURTHER ORDERED DENYING the Appellant's Request for Judicial Notice (doc.

52).

9

10

DATED this 22nd day of May, 2006.

11

12

13

14

15

_____
James A. Teilborg
United States District Judge

16

17

18

19

20

21

22

23

24

25

26